# United States Court of Appeals
## For the First Circuit

No. 25-1291

ARTHUR MILES,

Petitioner, Appellant,

v.

WARDEN FREDDIE BOWERS,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]
[Jennifer C. Boal, U.S. Magistrate Judge]

Before

Aframe, Lipez, and Howard, Circuit Judges.

Becca Steinberg, with whom Brian Wolfman, Regina Wang, and Georgetown University Law Center Appellate Courts Immersion Clinic were on brief, for petitioner-appellant.

Michael L. Fitzgerald, Assistant U.S. Attorney, with whom Leah B. Foley, U.S. Attorney, was on brief, for respondent-appellee.

April 27, 2026

**LIPEZ**, <u>Circuit Judge</u>. The First Step Act of 2018 ("FSA") provides qualified federal prisoners the incentive of time credits to shorten their sentences in exchange for participation in programs designed to reduce recidivism. <u>See</u> Pub. L. No. 115-391, §§ 101-102, 132 Stat. 5194 (codified in scattered sections of 18 U.S.C. and 21 U.S.C.). Petitioner-appellant Arthur Miles was sentenced in October 2022 and April 2023 to a total of 300 months' imprisonment for two separate federal convictions. In the petition for habeas relief now before us, <u>see</u> 28 U.S.C. § 2241,[1] Miles claims that the Bureau of Prisons ("BOP" or "the Bureau")[2] violated the FSA when it refused to award him credit for work he performed while housed at a county jail during the fifteen months between his first sentencing and his transfer to a federal facility.

After the BOP moved to dismiss Miles' petition, the magistrate judge to whom the motion was referred concluded that the regulations invoked by the BOP to deny credit to Miles "are contrary to the express language of the FSA." Report and Recommendation at 6, <u>Miles</u> v. <u>Bowers</u>, No. 24-11243, 2025 WL 418744,

---

[1] A petition for habeas relief under 28 U.S.C. § 2241 "is the proper vehicle for a prisoner to challenge the manner, location, or execution of his sentence," including challenges to "the calculation of . . . sentencing credits under the FSA." <u>Sharma</u> v. <u>Peters</u>, 756 F. Supp. 3d 1271, 1274 (M.D. Ala. 2024).

[2] The named respondent is Warden Bowers of FMC Devens, the federal facility where Miles has been housed. We refer to the BOP because it is the entity responsible for implementing the relevant sections of the FSA. <u>See</u> 18 U.S.C. § 3621(h).

at *3 (D. Mass. Jan. 15,2025).  The district court, however, rejected the magistrate judge's recommendation to dismiss the BOP's motion and instead dismissed Miles' petition.  See Miles v. Bowers, No. 24-11243, 2025 WL 417333, at *1 (D. Mass. Feb. 6, 2025).  For reasons we shall explain, we vacate the dismissal of Miles' habeas petition and remand for further proceedings.

## I.

The FSA sets forth a detailed scheme for awarding and applying credits that certain federal prisoners may earn for participating in "evidence-based recidivism reduction programming" ("EBRR programs").  18 U.S.C. § 3632(d)(4).  An EBRR program is an activity that either "has been shown by empirical evidence to reduce recidivism" or that research suggests will "likely . . . be effective in reducing recidivism," and that "is designed to help prisoners succeed in their communities upon release from prison." Id. § 3635(3)(A)-(B).[3]  The statute specifies that such programs

---

[3] Under the FSA, "[p]riority for participation in [EBRR programs] shall be given to medium-risk and high-risk prisoners." 18 U.S.C. § 3621(h)(6).  The statute also provides for credits when certain prisoners participate in a second programming category, termed "productive activities" ("PAs"), id. § 3632(d)(4)(A), which are defined as activities "designed to allow prisoners determined as having a minimum or low risk of recidivating to remain productive and thereby maintain a minimum or low risk of recidivating," id. § 3635(5).  Because we understand Miles to claim that his eligibility for credit stems from his participation in an EBRR program, we focus primarily on that category.

"may include . . . a prison job."  Id. § 3635(3)(C)(xi); see also 28 C.F.R. § 523.41(a)(11) (listing "[i]nmate work and employment opportunities" among the "types of activities" that may be designated as EBRR programs).

A key component of the FSA is the development of a "risk and needs assessment system," referred to as "the 'System.'" 18 U.S.C. § 3632(a).  In relevant part, the FSA states that the System

> shall be used to--
>
> (1) determine the recidivism risk of each prisoner as part of the intake process, and classify each prisoner as having minimum, low, medium, or high risk for recidivism;
>
> (2) assess and determine, to the extent practicable, the risk of violent or serious misconduct of each prisoner;
>
> (3) determine the type and amount of evidence-based recidivism reduction programming that is appropriate for each prisoner and assign each prisoner to such programming accordingly, and based on the prisoner's specific criminogenic needs . . . .

Id. § 3632(a)(1)-(3).  The statute also requires "reassess[ing] the recidivism risk of each prisoner periodically" so that inmates can be assigned to programs "based on the revised determination to ensure that," inter alia, they are able to successfully participate in programs that will address their "specific criminogenic needs"

and give them "a meaningful opportunity to reduce their [risk] classification." Id. § 3632(a)(4)-(5).

The FSA requires the BOP to provide eligible prisoners "with the opportunity to actively participate in [EBRR programs] . . . , according to their specific criminogenic needs, throughout their entire term of incarceration." Id. § 3621(h)(6) (stating that the BOP "shall provide" such programming).[4] When prisoners successfully complete such programming, they "shall earn" credits -- at a rate of at least ten days for every thirty days of participation -- that may be applied to reduce their period of incarceration. See id. § 3632(d)(4)(A); (d)(4)(C).[5] However, accumulating credits does not guarantee a lesser sentence. A prisoner's entitlement to a reduced sentence based on credits earned under the FSA depends on the outcome of "periodic risk reassessments." Id. § 3624(g)(1)(B). Only prisoners who have "maintained a minimum or low recidivism risk" based on that assessment, or who have consistently "demonstrated recidivism risk

_____

[4] The statute excludes some prisoners from eligibility for FSA credits based on their crimes or immigration status. See 18 U.S.C. § 3632(d)(4)(D) (listing disqualifying offenses, including violent and terrorism-related crimes); id. § 3632(d)(4)(E) (excluding prisoners subject to final removal orders). The BOP does not contend that Miles is categorically ineligible for FSA credits.

[5] The statute also provides other benefits for successful participation in EBRR programs, including phone privileges and additional visitation time. See 18 U.S.C. § 3632(d)(1).

reduction," may have their earned credits applied toward early release.  Id. § 3624(g)(1)(B).  Credits are not applied until a prisoner has "earned time credits under the risk and needs assessment system . . . in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment."  Id. § 3624(g)(1)(A); see also id. § 3632(d)(4)(C).

Prisoners may not earn credits for taking part in programming "prior to the date that the prisoner's sentence commences under section 3585(a)."  Id. § 3632(d)(4)(B)(ii).  Under the FSA, a sentence "commences on the date the defendant is received in custody awaiting transportation to . . . the official detention facility at which the sentence is to be served."  Id. § 3585(a).  Although that provision contemplates that prisoners may earn credits before reaching their assigned federal detention facility, a BOP regulation issued to implement the FSA identifies a different starting point for a prisoner's sentence: "the date the inmate arrives . . . at the designated [BOP] facility where the sentence will be served."  28 C.F.R. § 523.42(a).  The BOP also takes the view that "[f]ederal inmates in state custody are not eligible to earn [FSA credits]."  U.S. Dep't of Just., Fed. Bureau of Prisons, Program Statement 5410.01, First Step Act of 2018 -- Time Credits: Procedures for Implementation of 18 U.S.C. § 3632(d)(4) (Nov. 18, 2022) ("Program Statement 5410.01"), at 6 (Section 3(d)), available at

https//www.bop.gov/policy/progstat/5410.01_cn2.pdf

[https://perma.cc/B6UB-SS38].

The BOP further contends in this case that it is not required to award credits until after a prisoner has undergone the required "individualized risk and needs assessment." 28 C.F.R. § 523.41(c)(2).[6] The BOP maintains that the initial risk assessment is "[o]rdinarily" completed within twenty-eight days of an inmate's arrival at the designated federal facility and the needs assessment is "ordinarily" completed within thirty days of arrival. Program Statement 5410.01, at 8 (Section 5).[7]

Notably, although the BOP asserted in its brief that the risk and needs assessment is a precondition to earning credits,[8]

_____

[6] The "risk-and-needs assessment" is a multi-part process in which the BOP facility first determines a prisoner's "initial recidivism risk level" and, based on an assessment of the prisoner's needs, what EBRR programs (and PAs) are recommended. See Program Statement 5410.01, at 8 (Section 5); see also 18 U.S.C. §§ 3621(h)(1), 3632. The BOP uses a tool entitled "Standardized Prisoner Assessment for Reduction in Criminality . . . to assess the inmate in 13 need areas which can be targeted to reduce the inmate's risk of recidivating." Program Statement 5410.01, at 8 (Section 5).

[7] We do not know how frequently these assessments are in fact delayed beyond the "ordinary" timeframe. See, e.g., Morose v. Warden, FCI Berlin, No. 24-cv-270, 2025 WL 2900073, at *2 (D.N.H. Aug. 18, 2025) (reporting that petitioner arrived at his designated BOP facility on February 29, 2024, and had his first risk assessment on April 3 -- thirty-four days later), R&R approved and adopted sub. nom., Morose v. FCI Berlin, Warden, 2025 WL 2895941 (D.N.H. Oct. 10, 2025).

[8] For example, the BOP stated in its brief that "[a] prisoner cannot earn time credits without successfully completing

- 7 -

its position changed at oral argument. During the argument, BOP's counsel acknowledged that credits may be given -- and sometimes are given -- for pre-assessment prisoner activities considered by the BOP as "sufficiently equivalent" to an EBRR program or PA. The BOP asserted at oral argument, however, that it is not <u>required</u> to award credits for an inmate's participation in programs unless the risk and needs assessment has taken place.[9]

The BOP's fluid approach to awarding FSA time credits appears in at least two other circumstances. The BOP allows prisoners to earn time credits, even without participation in EBRR programs, when the prisoners are "able and willing" to complete programming post-assessment but suitable programming is unavailable. <u>Borker</u> v. <u>Bowers</u>, No. 24-10045, 2024 WL 2186742, at *2-3 (D. Mass. May 15, 2024) (emphasis omitted) (internal quotation marks omitted), <u>appeal dismissed</u>, 2024 WL 5319356 (1st Cir. Oct.

---

recidivism reduction programming. And a prisoner cannot successfully complete such programming unless he has first received a risk-and-needs assessment and been assigned to appropriate programming based on his risk and needs."

[9] BOP counsel stated during argument that, at times, the BOP has considered what a prisoner did before arrival at the designated BOP facility and "look[ed] at whether it [was] sufficiently equivalent to the EBRRs or PAs that they've approved, and award[ed] time credit. There's nothing prohibiting the BOP from doing that." Counsel explained that "the BOP's position is not that [the assessment] is required and needed. The BOP does and can award time credits prior to the assessment." Rather, the BOP's view is that "under the statute, an assessment is required in order to trigger mandatory entitlement."

25, 2024). For example, prisoners may earn time credits "while on any waitlist for EBRR [p]rograms . . . recommended based on the inmate's needs assessment, . . . as long as the inmate has not refused or declined to participate." Program Statement 5410.01, at 4 (Section 3(c)); see, e.g., Mohammed v. Stover, No. 3:23-CV-757, 2024 WL 1769307, at *6 (D. Conn. Apr. 23, 2024) (noting that inmates earn credits "by virtue of their 'opt-in' status, even if they are not actively participating in any assigned EBRR or PA"). Similarly, when "[t]emporary operational or programmatic interruptions authorized by the Bureau . . . prevent an inmate from participation in EBRR programs," the inability to participate "will not ordinarily affect an eligible inmate's 'successful participation' for the purposes of FSA Time Credit eligibility." 28 C.F.R. § 523.41(c)(3). In other words, in those circumstances, prisoners accrue credits based on the number of days they spend seeking to participate in programming that is unavailable for reasons attributable to the BOP.

By regulation, the BOP also specifies circumstances in which inmates "will generally not be considered to be 'successfully participating' in EBRR [p]rograms." Id. § 523.41(c)(4). The exclusions cover periods when an inmate is temporarily outside the designated federal facility, such as "for extended medical placement in a hospital or outside institution, an escorted trip, a furlough," and during "[t]emporary transfer to the custody of

- 9 -

another [f]ederal or non-[f]ederal government agency (e.g., on state or [f]ederal writ, [and] transfer to state custody for service of sentence, etc."). Id. § 523.41(c)(4)(ii), (iii).

**II.**

Miles claims that he is entitled to time credits under the FSA for the work he performed at the Marion County Jail in Indianapolis, Indiana, starting immediately after his first sentencing in October 2022. He argues that his sentence "commence[d]" under the FSA at that time because he was thereafter "awaiting transportation to . . . the official detention facility" where he would serve his term of imprisonment. 18 U.S.C. § 3585(a). Although Miles did not arrive at his designated federal facility, FMC Devens in Massachusetts, for another fifteen months, he maintains that the BOP's choice to leave him at the county jail until after his second sentencing -- and for another eight months after that -- cannot override his statutory right "to actively participate in [EBRR programs] . . . throughout [his] entire term of incarceration." Id. at § 3621(h)(6). In his habeas petition, Miles stated that, if the BOP properly credited him, his sentence would be reduced by about 150 days.

Miles does not claim in this appeal that he is necessarily entitled to have time credits applied to his sentence -- a determination that, as explained above, would be made only after he had demonstrated the requisite reduced or

- 10 -

limited risk of recidivism toward the end of his prison term.  See id. § 3624(g)(1)(B).  Nor do we understand Miles to claim that we should, in this appeal, simply accept his contention that the work he performed as an orderly at the county jail met the requirements of "a prison job" that qualifies as an appropriate EBRR program for him.  Id. § 3635(3)(C)(xi).  Neither the BOP nor the district court considered the requirements for a qualifying job -- or, indeed, the factual question of what tasks Miles performed at the jail -- because they concluded that Miles was ineligible to earn FSA credits regardless of what he did there.[10]

In recommending against the BOP's motion to dismiss Miles' petition, the magistrate judge, agreeing with numerous

---

[10] In its brief, the BOP states that "Miles has not alleged that he completed EBRR programs or PAs while at Marion County Jail, and the BOP does not have any evidence indicating that he did." It also contends that "Miles did not successfully complete recidivism reduction programming while detained at Marion County Jail."  However, in his Memorandum in Support of his Petition for Writ of Habeas Corpus, Miles stated that he "worked productively as a Unit Orderly."  And, on appeal, Miles contends that he is entitled to time credits based on his work at the jail, emphasizing the FSA's inclusion of a "prison job" as a qualifying activity. 18 U.S.C. § 3635(3)(C)(xi).

At oral argument, the BOP pointed out that the FSA provides only that an EBRR program "may include" prison work, id., not that "all types of prison work qualify."  To the extent the BOP is contending that the type of work Miles performed at the Marion County Jail would not, as a factual matter, qualify as an EBRR program if performed at FMC Devens, it does not explain why.  In any event, at this point -- to reiterate -- the nature of the work Miles performed at the jail, and whether such work would qualify as an EBRR program or PA, is not before us.

district courts, identified the conflict noted above between the FSA and the BOP regulations prohibiting inmates from earning time credits until after they arrive at a federal facility and undergo the risk and needs assessment:

> [T]he FSA plainly requires that a prisoner "shall" earn time credits at the rate described for all EBRRs and PAs the prisoner completes, so long as such programming occurred after the enactment of the FSA and after the person's "sentence commences." The definition of when a "sentence commences" is also clear; it is "the date the defendant is received in custody awaiting transport to" whatever facility the BOP designates. The statutory language is unambiguous. The BOP's regulation, however, "does not mirror the language in the FSA defining when a prisoner can begin earning FSA time credits," and instead "specifies a different date as the one when the prisoner can begin to earn FSA time credits."

Report and Recommendation at 6, Miles, 2025 WL 418744, at *3 (quoting Yufenyuy v. Warden, 659 F. Supp. 3d 213, 217-18 (D.N.H. 2023)); see also id. (citing Patel v. Barron, No. C23-937, 2023 WL 6319416, at *5 (W.D. Wash. Sept. 5, 2023), R&R approved and adopted, 2023 WL 6311281 (W.D. Wash. Sept. 28, 2023); Umejesi v. Warden, No. 22-cv-251, 2023 WL 4101471, at *4 (D.N.H. Mar. 16, 2023), R&R approved and adopted, 2023 WL 4101455 (D.N.H. Mar. 30, 2023)).

The district court took a different view of the law. Although the court described the magistrate judge's assessment as "thoughtful and compassionate," it observed that "the FSA left it

- 12 -

to the BOP to implement rules for determining when an inmate commences eligibility to earn [FSA time credits]." Miles, 2025 WL 417333, at *1. Reiterating its holding in a prior case, the court concluded that the BOP's rule "exclud[ing] an inmate's participation in programming while temporarily transferred to the custody of non-BOP designated institution[s]" -- even if unfair -- does not "'contravene[] the FSA or otherwise violate[] [an inmate's] federal rights.'" Id. (fifth alteration in original) (quoting Dunlap v. Warden FMC Devens, No. 24-cv-11462, 2025 WL 35248, at *1 (D. Mass. Jan. 6, 2025)).[11]

Before us, Miles argues that the magistrate judge was correct and that he was entitled to earn FSA time credits immediately after his first sentencing, notwithstanding the BOP's decision to leave him at the Marion County Jail for the ensuing fifteen months.

_____

[11] The facts in Dunlap were different from those before us because the prisoner had initially been placed in his official detention facility before being moved temporarily. See Report and Recommendation on Respondent's Motion to Dismiss, Dunlap v. Warden FMC Devens, No. 24-cv-11462, 2024 WL 5285006, at *3 (D. Mass. Dec. 13, 2024). Consistent with its regulations, see 28 C.F.R. § 523.41(c)(4)(ii), (iii), the BOP denied FSA time credits for that temporary period, when the prisoner "was detained in a non-BOP facility while awaiting a hearing on a writ of habeas corpus in an unrelated matter." Dunlap, 2025 WL 35248, at *1. The magistrate judge who first evaluated the case, and described the circumstances as "palpably unfair," Dunlap, 2024 WL 5285006, at *6, reported that Dunlap had been moved from a federal facility, where he had begun earning time credits, and ultimately spent fifty-three days in a non-BOP facility, "all in order to attend a hearing that lasted approximately two hours," id. at *3.

- 13 -

The question before us -- whether the BOP properly deemed Miles ineligible to accrue FSA time credits during the fifteen months he spent at the Marion County Jail -- encompasses four potential inquiries: (1) whether the BOP may delay the accrual of FSA time credits until a prisoner arrives at the designated BOP facility, as its regulation provides; (2) whether the FSA's risk and needs assessment is a prerequisite for a prisoner's entitlement to earn credits; (3) even if the answer to both prior questions is "no," whether the BOP may nonetheless deny credit for programs undertaken by a prisoner while housed at a non-BOP designated facility if those programs would, as a factual matter, constitute appropriate EBRR programs if undertaken at their designated BOP facility; and, finally, assuming the answer to all three prior questions is "no," (4) whether Miles was ineligible to earn credits for the period between his first and second sentencings because his sentence had not yet "commenced" for purposes of the FSA. We consider each of those questions in turn.

## A. The Start of the FSA Clock

The BOP notes, but does not defend, its regulation stating that a prisoner's sentence commences upon arrival at a federal facility, 28 C.F.R. § 523.42(a), presumably because any

such defense would be a non-starter.[12]  As the magistrate judge in this case, and the multiple courts it cited (and many others) have observed, the view expressed in the regulation of when a sentence commences plainly conflicts with the text of the FSA.  See supra Section II; see also, e.g., Morose v. Warden, FCI Berlin, No. 24-cv-270, 2025 WL 2900073, at *2 (D.N.H. Aug. 18, 2025) (citing other cases), R&R approved and adopted sub. nom., Morose v. FCI Berlin, Warden, 2025 WL 2895941 (D.N.H. Oct. 10, 2025); but see Hernandez v. Nunez, No. 3:25-cv-01380, 2026 WL 172453, at *2-3 (D. Or. Jan. 22, 2026) (noting a "split in authority," citing cases).  The statute defines the commencement of a sentence as "the date the defendant is received in custody awaiting transportation to . . . the official detention facility at which the sentence is to be served."  18 U.S.C. § 3585(a).  There is no way to reconcile "arrival" at a facility as it appears in the BOP's regulation with "awaiting transportation to" that facility.  The latter inescapably encompasses a recognition that the inmate can be in custody somewhere other than the designated federal facility when the sentence "commences."[13]  The BOP's conflicting regulation is

---

[12] The BOP did rely on the regulation in the district court. See Memorandum in Support of Respondent's Motion to Dismiss at 1, 7-8, Miles v. Bowers, No. 24-11243 (D. Mass. Aug. 13, 2024), Dkt. 14.

[13] The FSA by its terms applies even if an inmate is not in the physical custody of the BOP.  The term "prisoner" as used in the statute "means a person who has been sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal

- 15 -

thus invalid, see, e.g., Decker v. Nw. Env't Def. Ctr., 568 U.S. 597, 609 (2013), and Miles could not properly be denied time credits based solely on the fact that his work as an orderly preceded his arrival at FMC Devens.

## B. Whether the Risk and Needs Assessment is a Prerequisite for Earning Credits

The FSA directs that a prisoner's initial risk and needs assessment be performed "as part of the intake process" post-sentencing and that the results will then be used to "determine the type and amount of [EBRR] programming that is appropriate for each prisoner and [to] assign each prisoner to such programming accordingly, and based on the prisoner's specific criminogenic needs." Id. § 3632(a)(1), (3); see also id. § 3635(6)(A) (defining the "risk and needs assessment tool" as a method "to determine . . . as part of the intake process, the risk that a prisoner will recidivate upon release from prison"); id. § 3635(6)(B) (stating the programming component of the "risk and needs assessment tool"). As described above, however, per BOP policy, the risk and needs assessment may not be done -- and the appropriate EBRR programs may not be identified -- until roughly a month after an inmate arrives at the designated federal facility. See Program Statement 5410.01, at 8 (Section 5). Meanwhile, the FSA also states that

_____

offense, or a person in the custody of the Bureau of Prisons." 18 U.S.C. § 3635(4) (emphasis added); see also id. § 3621(h)(7).

- 16 -

the BOP "shall provide" eligible prisoners "with the opportunity to actively participate in [EBRR] programs . . . , according to their specific criminogenic needs, throughout their entire term of incarceration."  18 U.S.C. § 3621(h)(6).

These timing-related provisions of the FSA trigger the debate between the parties on whether a prisoner who participates in qualifying programming before the risk and needs assessment is performed is entitled to FSA time credits.  Miles highlights the obligation of the BOP to provide him "with the opportunity to actively participate in" EBRR programs during his "entire term of incarceration," id. § 3621(h)(6) (emphasis added), a mandate that he claims means he must be given credit for EBRR programs in which he participates from the commencement of his sentence -- with or without a prior risk and needs assessment -- if those programs are subsequently determined to be appropriate for him based on his assessment.[14]  For its part, as reported above, the BOP abandoned the argument made in its brief that the risk and needs assessment

_____

[14] We do not understand Miles to argue that "the risk assessment tools need not be completed before the calculating or applying his time credits, but that such tools should look backwards to the date the sentence commences to determine the time credits he can possibl[y] earn."  Brenneman v. Salmonson, No. 5:22cv7, 2025 WL 957216, at *7 (E.D. Tex. Feb. 25, 2025), R&R approved and adopted, 2025 WL 914352 (E.D. Tex. Mar. 26, 2025). As explained below, we do not consider in this case the nature of the BOP's obligation to provide "the opportunity to" earn credits. 18 U.S.C. § 3621(h)(6) (emphasis added); see infra Section III.C.

- 17 -

is a precondition to earning credits. However, it contended at oral argument that the BOP is not <u>obligated</u> to award credits unless the assessment has been performed. <u>See</u> <u>supra</u> Section I.[15]

We are unpersuaded by the BOP's assertion that it can at will, and categorically, reject a prisoner's participation in pre-assessment programming without examining the circumstances -- as it seemingly did here in denying Miles credit for his work at the Marion County Jail. The BOP cannot reasonably say, on the one hand, that the risk and needs assessment is not a precondition for earning credits while, on the other hand, invoking the pre-assessment timing of a prisoner's engagement in programming as the rationale for refusing to award the prisoner credits. <u>See</u> <u>Claude</u> v. <u>Stover</u>, No. 3:24-cv-961, 2025 WL 375074, at *10 (D. Conn. Feb. 3, 2025) (stating that, because the BOP apparently does not view the FSA to "creat[e] an absolute requirement that FSA time credits may only be awarded after the risk and needs assessment has been completed and only for programs specifically assigned to an inmate based on that assessment," the

_____

[15] The BOP has made the same concession previously. <u>See</u> <u>Mohammed</u>, 2024 WL 1769307, at *4 ("BOP concedes it provides time credits to an inmate even before the inmate has gone through his or her risk and needs assessment."); <u>cf.</u> <u>Kvashuk</u> v. <u>Warden, FCI Berlin</u>, No. 23-cv-007, 2024 WL 4349850, at *4 (D.N.H. Sept. 30, 2024) (noting that "the BOP policy is to allow prisoners to begin to earn FSA time credits from the moment of their arrival at their designated facility, even if they have not yet completed all of their risk and needs assessments").

court "will no longer endorse such a rigid interpretation of the statute").

Moreover, the statutory obligation to provide prisoners "with the opportunity to actively participate in" EBRR programs during "their entire term of incarceration," 18 U.S.C. § 3621(h)(6), is incompatible with the BOP's claim that it can refuse to credit prisoners' participation in programming that it later determines meets the prisoners' "specific criminogenic needs" simply because that participation preceded the assessment that identifies those needs. As the BOP itself admits, no provision of the FSA proscribes awarding credits for successful pre-assessment participation. Reasonably construed, then, the FSA's mandate to give prisoners the opportunity to participate in EBRR programs throughout their term of imprisonment requires the BOP to award credits for successful participation in EBRR programs or their equivalent when that participation occurs after the starting point set by the statute -- the commencement of the sentence -- regardless of the timing of the risk and needs assessment. See id. § 3632(d)(4) (mandating that prisoners "shall earn" time credits for successfully completing EBRR programs).

We recognize that, as the BOP has argued, the sequencing of provisions in the FSA could reflect an expectation that the risk and needs assessment -- to be performed during the inmates' "intake process," pursuant to subsection (a)(1) of 18 U.S.C.

§ 3632 -- will occur before inmates are assigned and participate in programming identified in the assessment as suitable for their criminogenic needs, as specified subsequently in subsection (a)(3). However, as Miles points out, the FSA states only that "[t]he System shall provide guidance on the type, amount, and intensity" of the programming assigned to prisoners. Id. § 3632(b) (emphasis added). That terminology demonstrates an expectation that "[t]he System" -- whose primary component is the risk and needs assessment -- will be useful in the BOP's efforts to comply with the requirements of the FSA, but the language does not condition participation in qualifying programming, or the earning of credits, on a prior assessment.

By contrast, the FSA does expressly require assessing prisoners' risk of recidivism before their earned credits may be used to reduce their sentence. See id. § 3624(g)(1) (specifying the requirements for applying credits toward early release). Put simply, the fact that the risk and needs assessment is a prerequisite for applying credits does not mean that it is a prerequisite for earning them. Accord, e.g., Morose, 2025 WL 2900073, at *3 ("[T]he FSA does not limit a prisoner's eligibility to earn FSA credits to the period after they arrive at their designated facility and have undergone assessment."); Tantuwaya v. Birkholz, No. 2:24-cv-02891, 2024 WL 4805423, at *4 (C.D. Cal. Oct. 10, 2024) (holding that, "[b]ecause the statute mandates that

an inmate 'shall earn' [time credits] for programming completed after his sentence begins, with no requirement that an inmate first complete a recidivism score assessment, [p]etitioner should have been afforded the opportunity to begin earning [credits] on . . . the day [p]etitioner entered BOP's custody, awaiting transport to the BOP-designated facility to carry out the term of his imprisonment"), R&R approved and adopted, 2024 WL 4803522 (C.D. Cal. Nov. 15, 2024); Kvashuk v. Warden, FCI Berlin, No. 23-cv-007, 2024 WL 4349850, at *4 (D.N.H. Sept. 30, 2024) (observing that the relevant timing for FSA eligibility is commencement of the sentence).

We draw further support for concluding that the FSA cannot reasonably be construed to impose the risk and needs assessment as a mandatory precondition to earning FSA credits from the BOP's own explanation of the post-sentencing process for federal prisoners. In both the district court and on appeal, the BOP quoted the Supreme Court's observation that "[a]fter a district court sentences a federal offender, the Attorney General, through the BOP, has the responsibility for administering the sentence." United States v. Wilson, 503 U.S. 329, 335 (1992) (citing 18 U.S.C. § 3621(a)). In its brief to us, the BOP stated that its responsibility includes making the decision on "where the offender will serve out [the] term of imprisonment." It elaborated on that decision-making as follows:

- 21 -

> The BOP cannot make this designation immediately upon sentencing, as Congress has required the BOP, in making each designation, to consider a wide array of factors, such as "the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, [and] recommendations of the sentencing court."

Respondent-Appellee's Br. at 5 n.2 (alteration in original) (quoting 18 U.S.C. § 3621(b)).

Throughout the period needed to consider the relevant "array of factors," id., a prisoner who is in custody plainly is "awaiting transportation to . . . the official detention facility at which the sentence is to be served," and the prisoner's sentence has thus "commence[d]" for purposes of the FSA, 18 U.S.C. § 3585(a). Under the FSA, it is the start of that waiting period that triggers the eligibility to earn credits for taking part in recidivism-reduction programming. See 18 U.S.C. § 3632(d)(4)(B)(ii). Although the BOP argues correctly that the eligibility to earn credits is not the same as the right to earn them, the FSA creates that entitlement when it directs that prisoners must be provided the opportunity to participate in EBRR programs for the "entire term of [their] incarceration," id. § 3621(h)(6), and must earn credits for successfully completing such programming, id. § 3632(d)(4). That "entire" period

- 22 -

necessarily includes the time a prisoner waits to be designated to a federal facility.

In its brief, the BOP contended that its regulations make the risk and needs assessment a precondition by permissibly defining "[s]uccessful participation" in an EBRR program to "require[] a determination by Bureau staff that an eligible inmate has participated in the EBRR programs . . . that the Bureau has recommended based on the inmate's individualized risk and needs assessment."  28 C.F.R. § 523.41(c).  In making this point, the BOP appeared to be saying that its recommendation of a specific EBRR program, following the risk and needs assessment, is a condition precedent to earning credits for that EBRR program.  Yet, as we have described, the BOP admits that it does not, in fact, view the assessment as a precondition for awarding credits for all programming that precedes the assessment.[16]

---

[16] We do not disagree with the BOP to the extent it argues that a prisoner may be denied credits for programming that is irrelevant to their "specific criminogenic needs."  18 U.S.C. § 3632(a)(3).  We do not understand Miles to argue otherwise -- contrary to the BOP's assertion that "Miles would award time credits to a prisoner for participating in substance-abuse treatment even if the inmate had no condition to treat." The question here is whether successful completion of EBRR programs or equivalent programs before the risk and needs assessment occurs can be disregarded by the BOP even if that type of programming is subsequently determined to be appropriate for the prisoner's criminogenic needs.

- 23 -

Consistent with that admission, the regulation quoted above can be read to allow credit for programming that precedes the assessment so long as -- once the assessment is done -- the BOP's recommendation covers the type of programming in which the inmate previously participated. Indeed, otherwise, given the BOP's acknowledgement that the risk and needs assessment may not be completed until several weeks after an inmate arrives at the federal facility -- which could be months after prisoners commence their sentence[17] -- the regulation would exclude a substantial period from the "entire term of incarceration." 18 U.S.C. § 3621(h)(6). The regulation would thus conflict with the statute and Congress's objectives by undermining the early access to recidivism-reduction programming that the statute prescribes.

In sum, awarding credit for programming that precedes the risk and needs assessment ensures that prisoners who participate in EBRR programs or equivalent programs that are subsequently judged appropriate for the prisoners' "criminogenic needs" benefit from participating in recidivism-reduction programs during their "entire term of incarceration." Significantly, as

---

[17] We base this timing on Miles' experience. Eight of the fifteen months for which he seeks FSA time credits followed his second sentencing, when -- so far as the record shows -- he was waiting to be assigned to a federal facility without any pending proceeding that could alternatively explain his continued housing at the Marion County Jail.

Miles points out, denying credit for the successful completion of appropriate programming undertaken at any time after a prisoner's sentence commences disincentivizes prisoners' early participation in recidivism-reduction activities -- an impact directly at odds with the FSA's design to "provide incentives and rewards for prisoners to participate in and complete [EBRR] programs." Id. § 3632(d).[18]  Accordingly, if all other FSA requirements are met, prisoners may accrue FSA credits before undergoing the risk and needs assessment.

## C. Participation While Housed in a Non-Federal Facility

If the risk and needs assessment is not a prerequisite for earning FSA time credits, prisoners seemingly would be entitled to credit for participating in pre-assessment activities that qualify as EBRR programs suited to their criminogenic needs regardless of where those activities take place -- assuming, of course, that the participation occurs after "the defendant is received in custody" post-sentencing and is "awaiting transportation to . . . the official detention facility at which the sentence is to be served." Id. § 3585(a).  At oral argument,

---

[18] The BOP seemingly does recognize that, in certain circumstances, it would be improper to deny prisoners the opportunity to earn time credits -- including, as noted above, when prisoners must be placed on a waitlist for programming that has been identified as appropriate for their criminogenic needs. See supra Section I (describing circumstances in which inmates can earn credits when not actively participating in EBRR programs or PAs).

however, counsel for the BOP stated that the Bureau often does not have contracts with non-federal facilities, and it is therefore "difficult or sometimes impossible for the BOP to actually track and verify whether [prisoners have] actually participated in programming at those facilities."

Invoking that logistical challenge as a general proposition, however, sidesteps the key question before us: whether the FSA requires the BOP to give time credit if it can "track and verify" an eligible prisoner's successful participation in EBRR programs undertaken at locations other than the designated facility. With respect to Miles, for example, the BOP does not argue that it would be unable to confirm or evaluate his work as an orderly at the Marion County Jail. Cf. Brenneman v. Salmonson, No. 5:22cv7, 2025 WL 957216, at *7 (E.D. Tex. Feb. 25, 2025), R&R approved and adopted, 2025 WL 914352 (E.D. Tex. Mar. 26, 2025) ("Respondent [BOP] does not adequately explain why [p]etitioner's participation in the programs offered at the facility in which he was housed after sentencing but prior to his arrival at [the designated federal facility] should exclude [p]etitioner from earning FSA time credits, nor is there any evidence [p]etitioner was either non-compliant with, or opted out of, programming."). The BOP instead appears to argue that it has no obligation to determine what Miles did and whether his pre-assessment activity would meet the criteria for credit if undertaken at FMC Devens.

Consistent with our conclusion that the risk and needs assessment is not a prerequisite for prisoners' entitlement to time credits for their participation in EBRR programs, we hold that the location of the pre-assessment participation cannot be determinative. As noted repeatedly above, the FSA requires that federal prisoners be provided "with the opportunity to actively participate in [EBRR] programs . . . , according to their specific criminogenic needs, throughout their entire term of incarceration." 18 U.S.C. § 3621(h)(6). To comply with that directive, the BOP cannot choose to house prisoners outside a federal facility (or in an interim federal facility) after commencement of their sentences, and then disregard qualifying activities undertaken at such a site if it is feasible to confirm the prisoners' participation.[19]

---

[19] In Sharma, the court reached a similar conclusion regarding the petitioner's temporary stays in BOP facilities other than his designated one after he had already completed the risk and needs assessment. See 756 F. Supp. 3d at 1284. The BOP had deemed the petitioner ineligible to earn time credits during those periods. Although the circumstances are factually distinct, the court's observations are relevant here:

> Respondents do not explain why the facilities where Sharma was housed during the time the BOP considered him to be in "disallowed" status could not accommodate or assess his participation in FSA programming nor is there any evidence Sharma was either non-compliant with or opted out of programming. Inmates like Sharma should not be prevented from earning [time credits] based on a BOP designation system that prevents

- 27 -

We hasten to clarify the boundaries of that conclusion. As Miles' counsel acknowledged at oral argument, we have no need in this case to determine the extent of the BOP's obligation to provide opportunities for prisoners to earn FSA time credits after sentencing and while they await designation to "the official detention facility at which the sentence is to be served." Id. § 3585(a). Miles claims that he had such an opportunity and took advantage of it, and, given our conclusion about the BOP's obligation in such circumstances, we limit our decision to whether the BOP must consider the work he performed for time credits.

**D. Miles' Entitlement to FSA Time Credits**

In the district court, the BOP argued that Miles was ineligible to earn credits because, pursuant to the invalid BOP regulation, Miles' sentence did not "commence" until he arrived at the federal facility where he is serving his sentence. The BOP also argued that Miles was not entitled to time credits for participating in programming at the Marion County Jail because he needed to first undergo the risk and needs assessment. We have already rejected both arguments.

---

inmates from earning these time credits even though under the language of the statute there has been a determination that they are eligible to receive them.

Id.

- 28 -

Hence, the question we must now face is when Miles' sentence "commenced" for purposes of the FSA -- when, pursuant to the statute, Miles was "received in custody awaiting transportation to . . . the official detention facility at which the sentence is to be served." Id.; see also id. § 3632(d)(4)(B)(ii) (stating that a prisoner may not earn time credits "prior to the date that the prisoner's sentence commences under section 3585(a)"). Miles contends that he started serving his term of imprisonment on October 3, 2022, following his first sentencing. The government argues on appeal that the earliest possible date is April 28, 2023, following his second sentencing, because that was "the date that [Miles] was received in custody awaiting transportation to his BOP-designated facility." Appellee's Br. at 18 n.4. According to the BOP, after Miles' first sentencing, he was not housed at "the Marion County Jail to await transportation to his BOP-designated facility," but was there "to await trial in his second case." Id. (emphasis omitted).

In its memorandum to the district court in support of its motion to dismiss Miles' petition, the BOP made no argument about which of Miles' two sentencings triggered the commencement of his sentence for purposes of the FSA -- presumably because the BOP contended that the relevant date was Miles' arrival at FMC Devens. Miles thus argues that the BOP has waived the issue and cannot contest his position that the relevant date is October 2022.

- 29 -

We will disregard any waiver because we see no basis for treating the periods before and after Miles' second sentencing differently. Miles claims that he worked continuously as an orderly during his fifteen months of detention at the Marion County Jail following his first sentencing. Even if some part of the seven months he spent at the jail between sentencings could be attributed to the government's decision to keep him at the jail while the second prosecution was pending -- perhaps for convenience -- Miles was at the same time also awaiting assignment and transfer to his designated federal facility. To put a fine point on matters, there would have been nothing that we know of to prevent the BOP from moving Miles to his designated BOP facility and returning him to the Marion County Jail when it was time for his second trial, or plea, and sentence. Indeed, after the second sentencing, eight more months passed before Miles was transported to FMC Devens. Hence, we cannot conclude that the previous seven months warrant different treatment with respect to Miles' entitlement to time credits under the FSA. Rather, the entire fifteen-month period Miles spent at the Marion County Jail after his first sentencing should have been considered by the BOP in evaluating whether he earned FSA time credits for the work he performed as an orderly there.

In so holding, we add the same caveat expressed by the magistrate judge in Brenneman v. Salmonson, a case involving a

petitioner who challenged the denial of FSA time credits while "he was awaiting transport to the BOP for over 13 months."  2025 WL 957216, at *5:

> [T]he undersigned is not endorsing a specific way to address inmates who have significant delays between sentencing and arrival at the BOP facility.  The BOP is in the best situation to determine the proper way to address such situations -- whether it be a rebuttable presumption that an inmate was, or was not, actively seeking to participate in programming, a review of the prisoner's activities in the non-BOP facility, or first requiring an inmate to complete a specific level of participation in EBRR programs at his designated facility before considering pre-arrival custody.  The point is not that such inmates must automatically receive FSA time credits, but rather, that the BOP cannot adopt a regulation that automatically determines such pre-arrival custody time ineligible based on improperly defining when "sentencing commences."

Id. at *5 n.2.

In sum, because Miles was eligible to earn FSA time credits during the fifteen months he was housed at the Marion County Jail, the BOP must "make an individualized determination" of his entitlement to such credits.  Claude, 2025 WL 375074, at *10.

**IV.**

We recap our holdings:

(1) The BOP's regulation providing that a sentence does not commence until a prisoner arrives at the designated BOP

- 31 -

facility is invalid -- as the BOP implicitly concedes by failing to defend it;

(2) The risk and needs assessment is not a prerequisite for entitlement to FSA time credits;

(3) A prisoner may earn FSA time credits for successful completion of pre-assessment programming even when housed outside a federal facility;

(4) Miles may be eligible for FSA time credits based on his work as an orderly during his entire fifteen-month tenure at the Marion County Jail.

We leave it to the district court on remand to determine the appropriate next steps in ensuring that Miles' work is given due consideration for FSA time credits.

Vacated and remanded for further proceedings consistent with this opinion.  So ordered.